[No. A106600. First Dist., Div. Three. Oct. 6, 2005.]

CONRAD LEE KLEIN, as Cotrustee, etc., et al., Plaintiffs and Respondents
v.
SUZAN HUGHES, Defendant and Respondent;
KIRK D. HARTMAN et al., Defendants and Appellants.

**COUNSEL**

Richard M. Norman, Matthew P. Guasco, Charles E. Whitesell and Herbert A. Stroh for Defendants and Appellants.

No appearance for Plaintiffs and Respondents.

Allan B. Cutrow, Peter B. Gelblum and Karl de Costa for Defendant and Respondent.

## OPINION

**PARRILLI, J.**—Kirk D. Hartman and William and Patricia Gillespie appeal from a probate court order prorating estate taxes. They contend the court improperly charged them with a portion of another beneficiary's estimated future income taxes. We agree, and reverse. The estate tax proration provisions of the Probate Code do not contemplate the consideration of future income tax consequences. Neither does *Estate of Bixby* (1956) 140 Cal.App.2d 326 [295 P.2d 68] (*Bixby*), the authority relied on by respondent to justify the order before us. *Bixby* did not address estate tax proration and establishes only the probate court's equitable authority to make adjustments for immediate tax consequences in distributing the estate. A more cautious and predictable approach is suggested by the current state of the law—unless income tax consequences can be ascertained with reasonable certainty for purposes of equitable reallocation at the time of distribution, the beneficiaries of an estate are responsible for paying their own future taxes.

### BACKGROUND

Mark R. Hughes, the founder of Herbalife, Inc., left a large estate. The sole beneficiary of the estate is a trust. The primary beneficiary of the trust is Alexander Reynolds Hughes (Alex), Mark's son, born in 1991. The trust provides for specific bequests of Herbalife stock to various beneficiaries, including appellants. Mr. Hartman received 310,000 shares and the Gillespies 100,000 shares each. Alex received 2 million shares, which was by far the largest specific bequest (aside from appellants' shares, four other individual beneficiaries received a total of 190,000 shares, and a foundation received 200,000 shares). Alex is also the sole residuary beneficiary of the trust.

On a previous appeal, we affirmed a probate court order approving a proposed loan transaction the trustees negotiated with the Internal Revenue Service (IRS) for tax planning purposes.[1] This arrangement, characterized by the parties as a "*Graegin* transaction" (*Estate of Cecil Graegin* (1988) T.C. Memo 1988-477 [56 T.C.M (CCH) 387]), operated as follows: Hughes

---

[1] *Klein v. Hughes* (Apr. 20, 2004, A103940) [nonpub. opn.]. That appeal, like this one, was transferred to this court from the Second District Court of Appeal by order of the Chief Justice of the California Supreme Court. We grant appellants' request for judicial notice of our prior opinion and the petition for instructions underlying the order at issue in that case.

Investment Partnership, LLC (HIP), an entity controlled by the trust, loaned $49,953,945 at 8.6 percent interest to Zacadia Financial Ltd. (Zacadia), a limited partnership controlled by the family of the trustees' tax attorney. No payments were due from Zacadia for 25 years, until December 2027. HIP then borrowed the same amount from Zacadia at 8.75 percent interest. Both loans were on a zero coupon basis. Aside from a $10 million payment due in September 2005, no interim principal or interest payments from HIP to Zacadia were required or permitted until December 2027. Zacadia received around $125,000 as loan fee, and will gain around $12,020,000 from the "spread" between the interest rates.

The tax benefits from the *Graegin* transaction were very substantial. Because all the interest on the loan back to HIP from Zacadia was currently deductible, the trust's estate tax liability was reduced by $166,528,930 (from $212,460,485 to $45,931,555). Furthermore, the IRS agreed to value the Herbalife stock at $19.50 per share, the sale price in a merger transaction negotiated by the trustees, instead of the much lower market value of the stock on the estate tax valuation date ($8.375 for Class A shares and $8.25 for Class B shares). As a result, all beneficiaries enjoyed greatly reduced capital gains tax exposure. However, HIP was required to make annual income tax payments over the 25-year life of the loan to Zacadia for the "phantom" interest income imputed to HIP.

Due to the merger and sale of the Herbalife stock, the beneficiaries received no actual stock. Instead, the trustees made monetary distributions based on the $19.50 share value, withholding a portion of the funds to account for the beneficiaries' shares of the estate taxes. Under the terms of Hughes's will and trust, each beneficiary is responsible for his or her pro rata share of estate taxes as provided in the Probate Code. The trustees petitioned the probate court for approval of a proposed estate tax proration. For the beneficiaries of specific bequests other than Alex, the trustees' calculation was based on the shares' market value rather than the $19.50 value, to compensate for the fact that only the trust would enjoy the benefit of the estate tax deduction for administration expenses.

Respondent Suzan Hughes, Alex's mother and guardian, objected to the trustees' proposal, contending there was no reason to treat Alex's specific bequest differently. She also claimed it was inconsistent for the other beneficiaries to enjoy the capital gains benefits of the $19.50 valuation but to pay estate taxes based on the lower market values.

The trustees responded by filing an amended petition, asserting they were unable to determine how the Probate Code's estate tax proration provisions applied to the estate's circumstances. They proposed five different methods of

proration, all of which treated Alex's specific bequest the same as the others. They refrained from endorsing any of these methods, noting each benefited Alex and the other beneficiaries in different degrees. The trustees stated they would "leave it to the respective beneficiaries and their representatives to advocate the selection of whatever method they believe the law or equity requires." The probate court, however, asked the trustees to recommend one of the methods. The trustees responded by suggesting "Method D," the alternative most similar to their original proposal.

Appellants filed responses advocating the adoption of "Method E," a proposal developed by the trustees' accountants. This method used the $19.50 share valuation and apportioned estate taxes "in the proportion that the value of the property received by each person interested in the estate bears to the total value of all property received by all persons interested in the estate," as stated in Probate Code section 20111. Appellants contended this was the only method proposed by the trustees that conformed with the requirements of the Probate Code. It was also the method that resulted in the lowest estate tax burden on the specific bequests.

Suzan Hughes responded that the recommendations from all other parties failed to equitably adjust the estate tax proration to account for the *Graegin* transaction's income tax consequences for Alex, as residuary beneficiary. Suzan claimed that under *Bixby, supra,* 140 Cal.App.2d 326, the trustees were authorized to charge the other beneficiaries with a portion of the present value of Alex's future income tax liability on the interest income the trust would receive from Zacadia, to avoid the unjust enrichment of one class of beneficiaries at the expense of another class. She proposed the adoption of "Method E" with modifications to account for that future income tax liability.

The trustees filed a reply to Suzan's objections. They noted that any calculation of the present value of future income taxes was inherently speculative, given the variability of tax rates and the necessity of choosing a discount rate to determine present value. The trustees also observed that Alex, as the recipient of the largest specific bequest, might be best served by the proration method that would maximize the specific bequests. He stood to receive guardianship funds at the age of 18 and custodial funds by the age of 25, whereas his residuary bequest might not be received until he was 35.

The Gillespie appellants also filed a response to Suzan's objections, contending *Bixby* applied only to adjustments for income taxes accruing during the administration of the estate. They argued against any adjustment to account for Alex's future income tax liability, because (1) the beneficiaries of specific bequests had not been unjustly enriched at the expense of the residuary beneficiary, who enjoyed most of the estate tax savings flowing

from the *Graegin* transaction; (2) the amount of future income taxes was highly speculative, requiring predictions as to tax rates, deductions available to the trust, and the selection of a proper discount rate; and (3) by way of analogy, future tax consequences are not taken into account in marital property divisions; instead, the family courts retain jurisdiction to make readjustments if necessary, a course the probate court should not take in this case for reasons of finality and economy of judicial resources.

The probate court held a hearing at which all interested parties were afforded an opportunity to express their views on the proration issue. Toward the end of the hearing, the court announced it would adopt Suzan's proposal, using "Method E" with modifications to charge the beneficiaries of the specific bequests for a portion of the present values of the costs of the *Graegin* transaction and the trust's future income tax liability. Over appellants' objections, the court entered an order conforming with this approach. Estate taxes were prorated at $2.27 per share, interest paid to the IRS and the Franchise Tax Board at $0.22 per share, interest spread and loan costs for the *Graegin* transaction at $0.25 per share, and future estimated income tax at $2.67 per share, for a total of $5.41 per share. Alex's specific bequest was charged the same amount.

This appeal followed. (See Prob. Code, §§ 20123, subd. (b), 1303, subd. (*l*), 1304, subd. (c).)

## DISCUSSION

■ Unless otherwise directed by the decedent or by federal law, "any estate tax shall be equitably prorated among the persons interested in the estate in the manner prescribed in this article." (Prob. Code, § 20110.) "The proration . . . shall be made in the proportion that the value of the property received by each person interested in the estate bears to the total value of all property received by all persons interested in the estate . . . . " (Prob. Code, § 20111.) When these statutes were reenacted in 1986, the Legislature omitted a provision requiring a court order to accomplish the proration. Accordingly, the judicial proration proceedings prescribed in Probate Code section 20120 et seq. are optional. (Cal. Law Revision Com. com., 54A West's Ann. Prob. Code (1991 ed.) foll. § 20111, p. 276; former Prob. Code, § 971, Stats. 1943, ch. 894, § 1, p. 2740.)

Appellants claim the probate court in this case failed to follow the statutory proration formula. This is not entirely accurate; the court did allocate the estate taxes according to the formula provided by Probate Code section 20111. Indeed, the outcome sought by appellants is identical to that reached by the trial court, except they would eliminate the charge the court imposed

on them for future estimated income taxes. It is the propriety of that charge, not the proration of the estate tax per se, that is before us on this appeal. The parties have referred us to no legal authority on this point, and our own research has disclosed none.

■ Appellants contend the income tax charge was not authorized by the Probate Code or the *Bixby* precedent, was improperly based on purely speculative considerations, and amounted to an unfair windfall for Alex.[2] Respondent characterizes the charge as a *"Bixby* adjustment" that reasonably and equitably apportions the costs of the *Graegin* transaction among all the beneficiaries, consistent with the directive in Probate Code section 20110 that estate taxes be "equitably prorated." Whether controlling law authorized the probate court to consider future income tax consequences when it prorated the estate taxes is a question of law, which we review independently. (Cf. *KB Home v. Superior Court* (2003) 112 Cal.App.4th 1076, 1083 [5 Cal.Rptr.3d 587].) We conclude the charge for future estimated income tax is inconsistent with the statutory proration scheme, and *Bixby* has no application in the circumstances of this case.

1. *The Estate Tax Proration Statutes Do Not Contemplate Proration of Income Taxes*

The governing statutes refer to the proration of estate taxes, not income taxes. While Probate Code section 20110, subdivision (a) suggests the court has some equitable discretion in accomplishing the proration ("any estate tax shall be equitably prorated"), it also requires the proration to be performed "in the manner prescribed in this article." In the article so specified, the Legislature has authorized probate courts to make allowances for estate tax credits, exemptions, deductions, interest, and penalties. (Prob. Code, § 20112.) It has made no similar provision for income taxes payable by distributees, though it specifically addressed rarer tax consequences such as those attending specially valued real property under title 26 United States Code section 2032A (Prob. Code, § 20114), excess retirement accumulations under title 26 United States Code former section 4980A (Prob. Code, § 20114.5), and generation-skipping transfer taxes (Prob. Code, § 20200 et seq.).

■ The Legislature did account for future estate tax consequences in the proration process. If payment of the estate tax is extended under federal law, those who receive the specific property giving rise to the extension are liable for the extended tax when it becomes due. (Prob. Code, § 20115.) And the

---

[2] Appellants do not challenge the part of the order charging them a pro rata share of the interest spread and loan costs for the *Graegin* transaction.

personal representative or any interested party is authorized to seek modification of a proration order "whenever it appears that the amount of estate tax as actually determined is different from the amount of estate tax on which the court based the order." (Prob. Code, § 20124.) The Legislature made no similar provision for equalizing the effects of future income tax liability on property distributed from the estate. Notably, in neither of the provisions governing proration of estate taxes payable in the future did the Legislature contemplate that probate courts would engage in *estimation* of the future tax.

■ Income tax consequences are an inevitable aspect of most estate distributions. Presumably, the Legislature would have addressed them if it intended them to be a factor in the proration of estate taxes. We conclude the statutory procedure for estate tax proration does not include consideration of income tax consequences. If such consequences are reasonably ascertainable when the estate is distributed, they may be accounted for separately by way of a *Bixby* adjustment in appropriate circumstances, as we discuss next.

## 2. *Bixby Does Not Authorize Reallocation of Estimated Future Taxes*

In *Bixby*, the executor of the estate chose to deduct the expenses of estate administration on the estate's income tax return instead of on its estate tax return. By doing so, he saved $101,649.95 on the income taxes, but the estate taxes were $58,932.44 higher than they would have been had the deduction been taken on the estate tax return. The income beneficiary thus stood to gain a substantial tax saving, but at the expense of the residuary beneficiaries who, under the terms of the decedent's will, were responsible for paying all succession taxes. (*Bixby, supra,* 140 Cal.App.2d at pp. 330, 337.) In its order of preliminary distribution the probate court charged the income beneficiary with the portion of the income taxes attributable to the income she had received during the administration of the estate. The Court of Appeal held this was insufficient to repair the estate's loss of the estate tax deduction. It directed the probate court to charge the income beneficiary's account with a proportional share of the $58,932.44 the residuary beneficiaries would have gained had the executor applied the deduction to the estate tax return. (*Id.* at pp. 338–340.) The income beneficiary received around 47 percent of the estate's gross income during the fiscal year in question; the rest went to the residuary beneficiaries. (*Id.* at pp. 331, 339.)

The *Bixby* court explained: "[W]e adopt this rule because it places the burden of the income tax on the income legatee, where it properly belongs, and obviates any dislocation of the testator's bounty by shifting the burden of an income tax to a residuary legatee. While the executor's election as to the use of deductions under the present circumstances still enables the income beneficiaries to receive an actual cash benefit in the form of tax savings, by

the process of reallocating an appropriate portion of such savings to principal, no part of any beneficiary's inheritance is diminished so that another may reap a profit at his expense. It is within the province of the probate court to bring to its aid the full equitable powers with which as a superior court it is invested to [e]nsure that income beneficiaries do not profit at the expense of the remaindermen. (*Estate of Eilert* [(1933)] 131 Cal.App. 409, 416–417 [21 P.2d 630].)" (*Bixby*, *supra*, 140 Cal.App.2d at p. 339.)

Respondent contends that without the estimated income tax proration ordered by the court, Alex, like the remaindermen in *Bixby*, would suffer a diminishment of his inheritance so that appellants could profit at his expense. We disagree. There are several significant distinctions between *Bixby* and this case. First, *Bixby* was not a proration case. The governing statute then, as now, provided for proration of estate taxes unless the testator directed otherwise. (Former Prob. Code § 970, Stats. 1943, ch. 894, § 1, p. 2740; Prob. Code § 20110, subd. (b)(1).) The testator in *Bixby* provided for the payment of estate taxes from the residuary estate (*Bixby*, *supra*, 140 Cal.App.2d at p. 330), whereas Hughes directed that estate taxes be prorated as specified in the Probate Code.

Second, *Bixby* was concerned not with income taxes payable in the future, but with reallocating "an actual cash benefit in the form of tax savings." (*Bixby*, *supra*, 140 Cal.App.2d at p. 339.) Here, the actual cash benefit in the form of estate tax savings was appropriately allocated by the court's proration of the estate taxes. The court did not make an adjustment based on taxes that would have been immediately payable under an alternate scenario, as did the *Bixby* court. It attempted instead to shift some of Alex's future income tax burden to appellants, on the theory that those future taxes were one of the costs of the estate tax reduction accomplished by the *Graegin* transaction.

Third, in *Bixby* every dollar of income tax deduction was a lost dollar of estate tax deduction. Here, every dollar of interest taken as an estate tax deduction was not a dollar lost by Alex on his income taxes. The trade off in this case is attenuated and highly uncertain. The interest deducted from the estate taxes is chargeable as income to Alex in future years, but as appellants point out Alex's actual income tax consequences depend on future rates, the performance of trust investments, and the future tax strategies employed by the trust on Alex's behalf. While Alex will presumably pay some amount in taxes over the 25 years before the trust receives its interest payment from Zacadia, this liability is at least partially offset by the fact that the trust immediately borrowed the principal amount back from Zacadia and has the use of those funds to generate further income, while the trust's repayment of the bulk of the loan back is deferred for 25 years. This is hardly the sort of

straightforward "unjust enrichment at the expense of the residuary beneficiar[y]" considered by the *Bixby* court. (*Bixby*, *supra*, 140 Cal.App.2d at p. 338.)[3]

Nothing in *Bixby* suggests the court's equitable powers extend to the prediction of income tax liabilities 25 years into the future, and the reduction of such liabilities to present value for purposes of reallocation among estate beneficiaries.[4] If a beneficiary's income tax liability, perhaps even a future tax liability, were reasonably ascertainable during the administration of the estate, and if the tax liabilities of the beneficiaries were so disproportionate as to call for equitable adjustment, a reallocation in the distribution of the estate might be within the "full equitable powers" of the probate court. (*Bixby*, *supra*, 140 Cal.App.2d at p. 339.) That is not this case. Respondent does not claim Alex's future taxes are ascertainable with any reasonable certainty. She argues the court was empowered to make an approximation of future tax liability for the purpose of equalizing the tax burdens. We cannot agree, particularly since, as noted above, it is difficult to say that the tax liabilities were inequitably distributed among the beneficiaries.

■ To sum up, neither *Bixby* nor the proration statutes authorize the probate courts to guess at future income tax consequences for some beneficiaries, and impose current charges on others to ameliorate those potential consequences. Even when such consequences are the result of estate tax

---

[3] Indeed, it is far from clear that Alex's future income taxes may properly be viewed as a "cost" of the *Graegin* transaction that should equitably be spread among all beneficiaries. Alex would incur income tax liability on the returns from the trust's investments whether or not the *Graegin* transaction took place. That transaction was an enormously profitable form of investment for Alex, considering the estate and capital gains tax benefits he enjoyed without tying up a significant amount of trust capital. In addition to the tax savings for the trust, about 80 percent of the principal amount of the loan back from Zacadia will be available for other investments during the entire 25-year life of the loan. The other beneficiaries have no interest in those investments. Compared to Alex's gains and opportunities for future gain, the benefits of the *Graegin* transaction for the other beneficiaries might fairly be characterized as incidental.

[4] Appellants rely on *In re Marriage of Fonstein* (1976) 17 Cal.3d 738 [131 Cal.Rptr. 873, 552 P.2d 1169], for the proposition that it is beyond the court's equitable authority to speculate about future tax consequences. *Fonstein*, however, is not analogous. There, the trial court adjusted a community property division to account for the income tax consequences of the husband's withdrawal from his law partnership. (*Id.* at pp. 745–746.) The Supreme Court rejected this approach, noting there was no indication in the record that the husband intended to withdraw, and thus no evidence a taxable event had occurred during the marriage or in connection with the property division. (*Id.* at pp. 749–750, & fn. 5.) Here, the *Graegin* transaction was a "taxable event" that occurred during the estate proceedings. Nevertheless, *Fonstein* does stand for the general proposition that "hypothetical inequity in the distribution of . . . tax burdens" is not "adequate justification for introducing an unnecessarily complicated and speculative factor into the process of dividing . . . property." (*Id.* at p. 750.)

planning, the court should refrain from attempting to adjust for indeterminate future income tax consequences. We believe the soundest course, and the course most consistent with the Probate Code, is to let the burden of future income taxes on estate property follow the income unless such taxes are both inequitable and reliably calculable. The parties interested in an estate can plan around such a rule more predictably than a court can estimate what taxes may be paid by a party in future years.

## DISPOSITION

The proration order is reversed insofar as it imposes a charge for future estimated income tax; in all other respects the order is affirmed. Appellants shall recover their costs on appeal.

McGuiness, P. J., and Pollak, J., concurred.

The petition of respondent Suzan Hughes for review by the Supreme Court was denied December 21, 2005, S138912.